UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KYLE LASATER,<br><br>                    Plaintiff,<br><br>vs.<br><br>JOSH TEWALT, CHAD PAGE, and<br>WARDEN JAY CHRISTENSEN,<br><br>                    Defendants. | Case No. 1:23-cv-00230-AKB<br><br>**SUCCESSIVE REVIEW ORDER** |

Pending before the Court is an Amended Complaint filed by Plaintiff Kyle Lasater (Plaintiff). (Dkt. 8). Having reviewed the Amended Complaint, attachments, and other relevant records from the original action from which this case was severed, the Court issues the following Order.

**STANDARD OF LAW FOR SCREENING PRISONER COMPLAINTS**

The Court must screen prisoner and pro se complaints under 28 U.S.C. § 1915, liberally construing the pleadings to determine whether any claims should be dismissed. A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief" under a cognizable legal theory. Fed. R. Civ. P. 8(a)(2). To state a claim under 42 U.S.C. § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

**SUCCESSIVE REVIEW ORDER - 1**

Under Rule 8 and § 1915, the Court may dismiss some or all of the claims in a complaint for any of the following reasons:

- "insufficient facts under a cognizable legal theory," *Robertson v. Dean Witter Reynolds, Inc.*, 749 F.2d 530, 534 (9th Cir. 1984), meaning that the factual assertions, taken as true, are insufficient for the reviewing court plausibly "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009);

- "lack of a cognizable legal theory," *Robertson*, 749 F.2d at 534, including failure to state a claim upon which relief may be granted, 28 U.S.C. § 1915(e)(2)(B), or application of a procedural bar sua sponte (on the Court's own motion), *see, e.g.*, *Hebrard v. Nofziger*, 90 F.4th 1000, 1006 (9th Cir. 2024) (affirming dismissal based on *Heck v. Humphrey*, 512 U.S. 477 (1994));

- frivolousness or maliciousness, 28 U.S.C. § 1915(e)(2)(B); or

- seeking monetary relief from a defendant who is immune from such relief. *Id.*

A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 US. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

## BACKGROUND

To screen the Amended Complaint in this case requires a review of its context. On July 25, 2022 (mailbox rule date), Plaintiff sought to join a potential class action case challenging conditions of confinement initiated by inmate Jody Carr and signed by other inmates, in addition to Carr, Case 1:21-cv-00409-BLW-DKG (Case 409). In Case 409, United States District Judge B. Lynn Winmill determined that Carr had "a documented history of attempting to encourage others to file lawsuits and/or filing lawsuits on their behalf that contain speculative and exaggerated

claims." (*See Carr v. Nye*, Case 1:22-cv-00332-JCC, Dkt. 13 at 2 explaining Case 409, Dkt. 48 at 2-11). In Case 409, Plaintiff filed a motion to join and a complaint, both drafted by Carr. (Case 409, Dkts. 46, 46-1).

Upon initial screening in Case 409, Judge Winmill determined that he could not distinguish each inmate's claims from Carr's claims. Significantly, *all* of the many inmate concern forms and grievances attached to the original joint Complaint were Carr's; none were from other inmates. (*See* Dkt. 3-2 at 21-26; 3-3 at 2-26; Dkt. 3-4 at 2-25; Dkt. 3-5 at 2-7).[1] Therefore, Judge Winmill ordered each inmate to file his own amended complaint "stating allegations specifying the 'who, what, where, when, why, and how' of each of their claims, whereupon the Court would determine the best procedural vehicle for the claims to proceed." (Case 409, Dkt. 20 at 2).

Despite Judge Winmill's efforts to have each plaintiff describe his own claims, Carr drafted nearly all of the separate amended complaints, many containing identical allegations. Judge Winmill deemed it "important for the Court to obtain more information about the conditions of confinement in IMSI close-custody unit J-1, other than from Carr's pen." (Case 409, Dkt. 20 at 11-12). Judge Winmill ordered a Martinez report to be accompanied by prison records from Defendants and a Spears hearing for other inmates to explain which portions of their pleadings were based on personal knowledge. (*See* Case 409, Dkts. 48, 80). Carr was provided an opportunity to amend his own claims in his severed case. (Case 1:22-cv-00200-DCN, Dkts. 1, 5).

---

[1]     One class representative's exhaustion "is enough to satisfy [the PLRA's exhaustion] requirement for the class," *Gates v. Cook*, 376 F.3d 323, 330 (5th Cir. 2004), but the screening analysis as to whether a class action should be authorized must be based on the allegations of all inmates who have signed a pleading.

SUCCESSIVE REVIEW ORDER - 3

The instant case was severed from Case 409 because Plaintiff's claims arose from a different prison facility. Plaintiff was ordered to file an amended complaint by June 5, 2023 (Dkt. 2), but he was released on parole and did not file an amended complaint. On November 27, 2023, an Order Requiring Plaintiff to Act was issued. (Dkt. 4). On December 11, 2023, having been re-incarcerated, Plaintiff sought an extension of time to file his amended complaint, which was granted. (Dkts. 5, 6). Some or all sections of Plaintiff's Amended Complaint again were drafted by Carr. Plaintiff attested to the truthfulness of the allegations by signing the Amended Complaint under penalty of perjury. (Dkt. 8).

Plaintiff describes himself as a close-custody inmate diagnosed with mental health problems, who was on "strong mental health medications" at the time of the alleged incidents. (*Id.* at 2). Plaintiff's Amended Complaint contains some contradictory allegations, which may have arisen from differences between the interests of the drafter of the Complaint and the signatory of the Complaint. For example, Plaintiff's asserted theory is that double-celling of close-custody and mentally ill inmates caused a serious risk of violence and sexual assault to him between 2020 and 2022. He asserts that all such inmates should be single-celled for their safety and the safety of others. However, Plaintiff's attachments to the Amended Complaint show that he was not a victim, but the *perpetrator*, of many incidents of violence both at ISCC (which he claims is unreasonably dangerous) and in other facilities. Another unique factor related to Plaintiff's reports of violence is that, in two of four instances, Plaintiff's close-custody cellmates were his biological brothers— Shane Lassater (Shane) and Camron Belcher (Belcher). Because of these various factors, the Court has searched for a causal connection between the allegations that Defendant Chad Page officially

**SUCCESSIVE REVIEW ORDER - 4**

sanctioned a policy of double-celling close-custody and mentally-ill inmates beginning in December 2019 (Dkt. 8 at 3) and Plaintiff's harm or risk of harm during 2020 through 2022.

During the time period at issue, Plaintiff alleges that he (1) suffered physical assaults from other close-custody inmates as a result of double-celling; (2) witnessed inmate-on-inmate violence and inmate-on-staff violence; (3) was locked in his cell 24 hours a day for weeks with little telephone, visiting, and laundry time and only a 10-minute shower every three days; and (4) was provided very little indoor recreation and no outdoor recreation. These allegations are similar to those in Case 409, except those allegations arose from the Idaho Maximum Security Institution (IMSI), and those plaintiffs particularly asserted that close-custody inmates (who tend to attack others) should not be housed with protective-custody inmates (who tend to be the target of attacks), and close-custody inmates should not have been permitted open common area time with protective-custody inmates, because the common time facilitated assaults. (*See* Case 409).

In the Initial Review Order in this severed case, the Court gave Plaintiff specific instructions for drafting an amended complaint:

> In his new ISCC case, he will be required to file an amended complaint containing only his claims arising from confinement at ISCC against only those Defendants who personally participated in the alleged violations, along with one Defendant with authority to implement injunctive relief, should such relief be granted.
>
> The amended complaint must contain no allegations about Jody Carr, who is pursuing his claims in a different case. The amended complaint must state facts specifying the "who, what, where, when, why, and how" for each of Plaintiff's own personal claims in plain and simple language based on Plaintiff's own personal knowledge and must be signed under penalty of perjury. For example, Plaintiff alleges lack of out-of-cell time[,] [] outdoor recreation, opportunities to use the telephone, and regular showers. Plaintiff alleges that he has been housed at ISCC since 2018, which

is five years ago. Therefore it is important for him to pinpoint the
dates for each of these allegedly unlawful conditions.

He also alleges that he was involved in a physical altercation
with Camron Belcher in 2020. He should specify whether he has
been involved in any other altercations in the five years he has been
housed at ISCC, and, if so, specify the dates and details of those
incidents.

(Dkt. 2 at 1-2).[2]

Upon review of the Amended Complaint, the Court concludes that Plaintiff has not

complied with the prior Court Order requiring him to state sufficient facts to support a plausible

claim. (*Id*.). Plaintiff had approximately eighteen months, including time when he was not

imprisoned, to investigate facts and/or retain contingency or pro bono counsel. Because Plaintiff

had adequate instructions, time, and opportunity to amend his pleadings, but has failed to provide

sufficient facts to state a plausible claim, the Court will dismiss the "Verified Amended Prisoner

Complaint" with prejudice, for the following reasons. (Dkt 8).

## REVIEW OF AMENDED COMPLAINT

### 1. Claims of Serious Risk of Violence Caused by Double-Celling Inmates

#### A. *Eighth Amendment Standard of Law*

The Eighth Amendment to the United States Constitution protects prisoners against cruel

and unusual punishment. It does not protect against government officials' negligence, because,

such actions are not deemed an abuse of governmental power under § 1983, but rather "a failure

---

[2]     The Court requested that Plaintiff provide information about other altercations that reached
back five years to help assess Plaintiff's claims that Defendants had knowledge that celling
customs and policies caused an unreasonable level of violence at ISCC. However, the federal
statute of limitations period reaches back only two years and one month from the date of Plaintiff's
first filing in Case 409. Because Plaintiff filed his first complaint on July 25, 2022, the earliest
claims he can assert here are from June 25, 2020.

to measure up to the conduct of a reasonable person." *Daniels v. Williams*, 474 U.S. 327, 332 (1986).

An Eighth Amendment claim has two components. The first is an objective showing: Plaintiff must allege facts showing that he is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). The second component is a subjective showing: that Defendant acted with "deliberate indifference," which is "more than mere negligence," but "less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. To exhibit deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Id.* at 837. To satisfy the subjective component, a prisoner must show that a prison official was aware of and recklessly disregarded an excessive risk to an inmate's health or safety, which means drawing the inference from the factual circumstances that a substantial risk of harm exists, and yet ignoring it. *Id.*

"Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833 (internal quotation marks, citation, and alterations omitted). But even an obvious danger does not result in liability if the official is not subjectively aware of it. *Id.* at 843.

For example, in *Wilk v. Neven*, 956 F.3d 1143 (9th Cir. 2020), Plaintiff and inmate Nunley were housed together in Unit 8, one of two protective-custody units (7 and 8) in the prison. Nunley

SUCCESSIVE REVIEW ORDER - 7

threatened to attack and kill Wilk. Immediately, Wilk reported the threat to his unit floor officer and was moved to Unit 7 for his protection. *Id*. at 1145-46.

However, opportunities for contact between the inmates in Units 7 and 8 existed. For example, inmates from the two units passed each other in the yard while inmates were waiting to go to classes or medical appointments. Wilk filled out documentation outlining his need for protection and requesting that Nunley be placed on Wilk's administrative "enemy list," which would warn prison staff that Nunley posed a threat to him. Officials did not place Nunley on Plaintiff's enemy list. Four months later, Nunley attacked Wilk in the yard between Units 7 and 8. "Nunley allegedly exited his cell without authorization and attacked Wilk with stones, gravel, and his fists." *Id*. at 1146. On these facts, the United States Court of Appeals for the Ninth Circuit held that Wilk had stated sufficient facts about a substantial risk of harm to overcome summary judgment. *Id*. at 1150.

### B.  *Plaintiff's Claims of Unreasonable Risk of Violence*

Plaintiff alleges there were "approximately one to two acts of violence and/or sexual assaults every week on every double-celled close custody tier . . . [a]s well as, attacks on staff quite often." (Dkt. 8 at 4). To support this general allegation, he first relies on four incidents within his personal knowledge: (1) he and his cellmate assaulted another inmate in 2018 on D-1 (close custody/protective custody); he himself was assaulted on D-1 in 2019 and 2021; and he was assaulted again in "close-custody only" Unit G-1 in 2022. (Dkt. 8 at 4).

He also relies on the Martinez report from Case 409, where IMSI inmates were permitted to go forward with their unreasonable risk of violence claims as vulnerable inmates open to inmate

attacks by dangerous inmates in the common areas, rather than dangerous inmates being double-celled with each other. (*See* Case 409, Dkt. 57 15-17).

Finally, he relies on decades-old findings of the United States District Court in *Balla v. Idaho State Bd. of Corr.*, 595 F. Supp. 1558 (D. Idaho 1984), *reversed on other grounds,* 869 F.2d 461 (9th Cir. 1989). In that 1984 prison class action case that was closed in 2022, a federal court judge in the 1980s had discussed the dangers of double-celling close-custody inmates in a different prison facility, Idaho State Correctional Institution, citing reasons of cell size and the fact that there was an "undisputed . . . policy of placing every incoming inmate to the penitentiary in close custody result[ing] in the brutal rape of virtually every young man assigned to close custody. This indiscriminate policy was and is constitutionally impermissible." *Id.* at 1579.

The Court will now review the Amended Complaint's supporting factual allegations—Plaintiff's personal incidents, the Case 409 Martinez report, and the *Balla* case information.

## C. *First Incident of Violence*

The first personal incident occurred on October 4, 2018. Plaintiff was a perpetrator, not a victim, in this incident involving victim Nathan Bussell. At that time, Plaintiff's cellmate was one of his incarcerated brothers, Shane. After Plaintiff, Shane, and Bussell had argued in the showers and exited, Shane approached Bussell and began to attack him with closed fists to his torso and head. Both Lasater brothers were examined after the incident and found to have wounds consistent with their involvement in an altercation. (*See* Case 409, Dkt. 57-5 at 26). It was recommended that the Lasaters not be housed on the same walk as Bussell in the future. (*Id*. at 27).

This incident occurred beyond the statute of limitations, and thus it serves only to show it gave certain notice to prison officials. This incident would have provided prison officials with

notice that the Lasaters should not be housed with Bussell again, and, in fact, a notation to that effect was made in the inmates' files. (*Id.* at 27). It may have given notice that other inmates should be protected from Plaintiff, but not vice versa. It may have given notice that Plaintiff should not be housed with Shane, because it gave them opportunity to commit joint wrongdoing. [3] But there was no clear connection between the double-celling of inmate perpetrators and the attack of another inmate from a different cell in a common area. If inmates wanted to plan together to assault someone else, they could easily have made the plan during out-of-cell time. This incident shows only that close-custody inmates may attack each other in groups or in common areas, just as general population inmates may attack each other in groups or common areas. This incident does not support Plaintiff's claim of a serious risk of violence caused by double-celling close-custody and/or mentally ill inmates together.

### D. *Second Incident of Violence*

The second personal incident occurred seven months later, on May 6, 2019, when Plaintiff was attacked by inmate Casey Young. There are no allegations that Plaintiff and Young were cellmates at the time, and the IDOC Information Report shows that this attack happened in a common area. (*See* Case 409, Martinez Report, Dkt. 57-5 at 6, Exhibit 37 at 1-5). There is insufficient factual information to show that the assault was caused by prison officials' December 2019 official decision to double-cell close-custody and/or mentally ill inmates, or any prior decision to test out such a policy as of May 6, 2019.

---

[3]  Several years after the incident, IDOC investigator Sergeant Eixenberger noted the double-celling of the Lasater brothers had facilitated their ability to "band together" to attack another inmate, but this cause-and-effect theory is different from the one Plaintiff uses as the foundation of his claims—that cellmates are dangerous to each other. (*See* Dkt. 8-1 at 2; Martinez report in Case 409, Exhibit 37, pp. 6-7).

SUCCESSIVE REVIEW ORDER - 10

**E.  *Third Incident of Violence***

On February 28, 2021, almost two years after the Young incident, Plaintiff was attacked by another of his incarcerated biological siblings, Camron Belcher, while the two were cellmates in Unit D-1. (Dkt. 8 at 6). A prison record notation of a post-altercation interview between IDOC mental health staff member Hoyle and Belcher states: "The corporal reported that they were aware that he has a mental health condition and they were concerned about his safety and wellbeing." (Case 409, Dkt. 57-5 at 20). Belcher was found to be free from suicidal ideation; he "expressed hopefulness for the future"; he was agitated at first, but calmed down. (*Id*.). Hoyle cleared Belcher to return to his assigned housing. (*Id*.). Plaintiff  asserts that he himself had a mental health condition for which he takes "strong mental health medications." (Dkt. 8 at 2).

The mere presence of inmate mental health conditions (many of which are managed by prescription medications) does not show that prison officials drew an inference that these two brothers posed a risk of serious bodily harm to one another. Plaintiff has not alleged that, before the attack, he reported to prison officials that he believed Belcher posed a serious risk of bodily harm and should not be housed with him. Nor did Plaintiff report that he, himself, was a serious risk of harm to Belcher (and, in fact, Plaintiff restrained himself from counterattacking Belcher during the incident, showing that, despite his mental illness conditions, Plaintiff was able to refrain from engaging in a physical altercation).

A description of the incident was included in the Martinez report in Case 409:

> A review of IDOC records reveals that Offender Lasater and Offender Belcher are brothers and did engage in a physical altercation on February 28, 2021, while they were celled together at ISCC. *See* Exhibit 36. Reading from the compiled reports, officers heard the sound of a verbal altercation inside their cell, raising

> concerns about the potential for escalation into a physical altercation. *See* Exhibit 36, pp. 2, 4.
>
> Officers investigated, and attempted to determine whether further intervention was warranted. *Id.* Shortly after officers had attempted to communicate with the offenders in their cell, Offender Belcher began to strike Offender Lasater. *Id.* Officers ordered them to cease fighting, and after the officers threatened to deploy OC spray into the cell, both offenders became compliant. *Id.* They were medically assessed, and no injuries were noted. *See* Exhibit 36, p. 1.
>
> Both were moved to segregation out of concerns for their safety, and to allow an investigation to be done. *Id.* DORs were issued as punishment for engaging in violence. *See* Exhibit 36, p. 2.

(Dkt. 57 in Case 409).

Plaintiff (or the drafter of his Amended Complaint) attempts to bolster this claim by falsely asserting that Plaintiff's prison records show that, in 2018 (before Belcher attacked him in 2021), prison officials had placed a note in Plaintiff's file strongly recommending that Plaintiff should not be housed with his brothers. *Id*. However, the attachment submitted to support this allegation shows that (1) the recommendation took place on May 5, 2022, more than a year *after* Belcher attacked him; and, as noted above, (2) the reason for the recommendation was that housing Plaintiff and his brother Shane together gave them opportunity *to plan an attack on Bussell*. (Dkt. 8-1 at 2). The 2018 report noted that *neither* Lasater brother should be housed *with Bussell*. (Case 409, Dkt. 57-5 at 27.)

Plaintiff has not alleged plausible facts showing that Belcher's attack on him was caused by Defendant Page's decision to house close-custody and/or mentally ill inmates in double cells, as opposed to being caused by some personal issue between Plaintiff and his brother that was unknown and unreported before the attack. If the facts pleaded are "merely consistent with a defendant's liability," the complaint has not stated a claim for relief that is plausible on its face.

SUCCESSIVE REVIEW ORDER - 12

*Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). This incident does not support a claim that a double-celling of close-custody and/or mentally ill inmates caused an unreasonable risk of violence at ISCC.

### F. *Fourth Incident of Violence*

Plaintiff was transferred from ISCC Unit D-1 (close custody/protective custody) in July 2021, to Mental Health Unit 16 for one day. Then, because he was found not to be qualified to live in Unit 16, he was transferred to a "close custody only" housing unit, G-1. (Dkt. 8-1 at 1).

The fourth incident occurred in Unit G-1 on April 28, 2022 (*See* Dkt. 8-1).  Plaintiff was attacked in his cell by cellmate Timothy W. Allen. (*Id*. at 4).

Plaintiff alleges that, the day before the incident, he pleaded with his case manager by email to move him, because he knew that the inmates in his unit had been planning all week to attack him because he had come from "protective custody." (Dkt. 8 at 5). Elsewhere in his Amended Complaint he asserts he was a "close-custody" inmate (*id*. at 2) and his "CIS" prison housing records show he had come from close-custody PC (Dkt. 8-1 at 1). Plaintiff provides no facts to show who received the emergency email (if anyone); no facts to show when the receiving employee read the email (if ever); no facts to show how Plaintiff knew that inmates were planning all week to attack him; and no facts to show, if he knew this all week, why he did not do more to notify prison staff, like directly speaking to on-duty correctional officers or turning in a  concern form and grievance.

Plaintiff's supporting attachment (Sergeant Eixenberger's interview of Plaintiff after the Allen assault to assess his request for protective custody) does not show that he requested protective custody *before* the Allen attack, but only that he did so *afterwards*. (Dkt. 8-1 at 1). Nor

does the attachment show that Plaintiff reported to Eixenberger that he had pleaded by email to his case manager to be moved because the inmates on his unit were planning all week to attack him because he came from protective custody. (*See* Dkt. 8-1). Additionally, Judge Debora Grasham's Report and Recommendation issued in Case 409, concluded: "A review of Offender Lasater's IDOC records at ISCC reveals he did not file any grievances related to requesting PC while incarcerated at ISCC during this time frame. (*See* Declaration of Syvanna LaBonte, para. 4." (Case 409, Dkt. 57 at 35)).

This incident does not show that any Defendant was on notice that Plaintiff felt at risk of serious harm from Plaintiff Allen or from other G-1 Unit inmates. Plaintiff's allegation that he sent an email to an unknown IDOC employee "the day before" the attack, when he knew the inmates had been planning the attack "all week," is too vague to show that any Defendant had notice of it.

Unlike the other three personal incidents, the fourth incident *does* provide some evidence that a close-custody inmate attacked another close-custody inmate who was his cellmate—but it is the only incident in the record supporting Plaintiff's theory, and it happened in a different unit.

### G.  *Other Reported Attacks*

Plaintiff cites to the Martinez report in Case 409 to show that many attacks occurred in other double-celled close-custody units (Dkt. 8 at 7); from this, he concludes that, generally, double-celled close custody is unreasonably dangerous. (*Id.*). Plaintiffs in Case 409 were permitted to proceed on their claim that their unit was unreasonably dangerous, based on the Martinez report showing various acts of violence from prison records and the plaintiffs' personal knowledge.

As noted above, the IMSI Martinez report claims were based on a different causal allegation: that close-custody inmates should not be housed with and have open access to

protective-custody inmates. The Court finds that the IMSI Martinez report claims of violence at IMSI does not support Plaintiff's claims because the causal elements of the claims are different; the facility is different; and, in Case 409, inmates provided specific plausible facts based upon personal knowledge to support their claims of a pattern of unreasonable violence.

The only other attacks that Plaintiff identifies are those in which he was the *perpetrator* at various facilities where he has been housed. At the "CAPP-Boise" facility, Plaintiff assaulted inmate Vickers on February 25, 2017. (Dkt. 8-2 at 7). At ISCI, Plaintiff assaulted inmate Carver on April 20, 2017, after Plaintiff came onto the tier and started an argument with Carver. (Dkt. 8-2 at 5). At ISCI, Plaintiff came from a different cell and assaulted inmate Duff while Duff was sleeping on July 6, 2017. (*See* Dkt. 8-2 at 3-4). At IMSI, Plaintiff and inmate Cavin engaged in a fight on the upper level of Tier 2 on September 1, 2017. (Dkt. 8-2 at 2 (partial record); Case 409, Dkt. 57, Exhibit 37, pp. 8-9). These incidents *caused by* Plaintiff do not support particular claims of a serious risk of violence at ISCC caused by double-celling, but perhaps could support a claim (brought by a victim of Plaintiff or one who feared him) that Plaintiff was a serious risk of violence to other inmates, regardless of where he was housed.

### H. *Balla Court Findings*

As noted above, the *Balla* Court made findings decades ago, from a different facility, and based on additional facts, such as the size of the ISCI cells and that unscreened inmates were permitted to live with young male inmates, causing an unreasonably high rate of sexual assaults upon the young inmates by the unscreened inmates. 595 F. Supp. at 1579-80 (citing an "indiscriminate" and "constitutionally impermissible" "policy of placing every incoming inmate

to the penitentiary in close custody result[ing] in the brutal rape of virtually every young man assigned to close custody").

Prison officials began to make changes to administration of the close-custody units even before the *Balla* trial began, prompting the court to find and conclude:

> The authorities at ISCI are making a commendable effort to eliminate double-celling in the close custody units in Houses 8 and 9. Movement on the tier has been significantly circumscribed and the level of violence has been greatly reduced. As presently programmed and maintained, this court is unable to find that close custody at ISCI is constitutionally impermissible in the way that it is now being administered. Hopefully, the Director of Corrections, the Warden at ISCI and the State Board of Corrections will be able to continue this program, and ultimately where an inmate is kept in close custody for most of the 24-hour day, he would not have to be double-celled. . . .
>
> As a result, this court concludes that close custody, as it presently exists, does not violate prisoner's constitutional rights.

*Id.*

When the *Balla* case was re-opened in 2005, the Court preserved the injunctive order pertaining to ISCI Houses 8 and 9, finding that it met the 1996 Prison Litigation Reform Act (PLRA)[4] requirements for continuing pre-1996 injunctive relief orders. The Court found the injunctive relief order "extends no further than is necessary to correct the Eighth Amendment violations, is narrowly drawn, and is the least intrusive way to correct the violations. The permanent injunction was narrowly drawn because it placed population caps on four units at ISCI [Units 9, 10, 11, and 13]." *Balla v. Idaho Bd. of Correction*, No. CV81-1165-S-EJL, 2005 WL 2403817, at *10 (D. Idaho Sept. 26, 2005), *clarified on denial of reconsideration*, No. CV81-1165-S-EJL, 2005 WL 3412806 (D. Idaho Dec. 9, 2005). When *Balla* concluded in 2022, this injunction

---

[4]        Pub. L. No. 104-134, 110 Stat. 1321, *as amended*, 42 U.S.C. § 1997e, *et seq.*

SUCCESSIVE REVIEW ORDER - 16

was uncontested and remained in place, but the United States Court of Appeals for the Ninth Circuit held that no other injunctions remained. *Balla v. Idaho*, 29 F.4th 1019, 1028 (9th Cir. 2022). In *Balla*, there never was an injunction in place as to all prison facilities' close-custody units, the ISCC facility, or ISCC close-custody units.

Because the *Balla* findings and injunctions were particular to facts existing in identified housing units at a different prison facility, Plaintiff cannot rely on statements or evidence in that case to support a present-day claim that double-celling close-custody inmates in a different facility is unconstitutional. To allow a plaintiff to make this leap would contravene the purpose of the PLRA's significant restraints on injunctive relief. The Court takes judicial notice that the IDOC's current published policy is to utilize a Reception and Diagnostic Unit (RDU) at ISCI, where inmate assessment occurs; nothing suggests that inmates are placed together in close custody indiscriminately.[5]

---

[5]    Inmates are screened in a designated "Receiving Diagnostic Unit." (*See* Standard Operating Procedure 303.02.01.001. chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/ https://forms-idoc.idaho.gov/WebLink/0/edoc/284983/Classification%20Inmate%20- %20SOP.pdf) (accessed 12/19/2024).

The IDOC website explains:

> The first stop for everyone who is sentenced to prison in Idaho is a reception and diagnostic unit (RDU). The men's RDU is at Idaho State Correctional Institution south of Boise. The two women's units are at the Pocatello Women's Correctional Center (PWCC) and the South Boise Women's Correctional Center (SBWCC). Your loved one will be at RDU for two to four weeks. During this time, they will undergo a variety of assessments, including physical and mental health exams, to determine their educational and treatment needs. The information that is gathered also helps determine at which facility your loved one will be living.

SUCCESSIVE REVIEW ORDER - 17

In addition, forty years ago, isolation of troublemaking inmates was a laudable goal, as noted in the 1980s *Balla* decisions, but, today, it is known that isolation of inmates can be damaging to a person's psychological well-being.[6] Hence, additional factors not considered in the 1980s must be accounted for in the safety and well-being equation today. There is no constitutional

---

("What to Expect When Your Loved One is Incarcerated" online at https://www.idoc.idaho.gov/ content/document/family-friends-guideIDOC) (accessed 12/19/2024).

Since 2005, as part of its PREA responsibilities, IDOC Standard Operating Procedures provide:

> During the Reception and Diagnostic process, all offenders entering the Department will attend an educational program designed to prevent the occurrence of rape and sexual activity. The education will include how to avoid risk situations, safely report rape and sexual activity, and obtain counseling if victimized. Offenders will receive the Department's handbook, "Maintaining Dignity, Prison Rape and Sexual Activity Elimination."

Standard Operating Procedure 325.02.01.001 (available online at chrome-extension:// efaidnbmnnnibpcajpcglclefindmkaj/https://www.prearesourcecenter.org/sites/default/files/library /preadocidaho.pdf) (accessed 12/19/2024).

[6]    In 2019, the Fourth Circuit held that solitary confinement conditions on death row violate the Eighth Amendment. *Porter v. Clarke*, 923 F.3d 348 (4th Cir. 2019). The Third Circuit Court of Appeals held that from 2020 "forward, it is well-established in our Circuit that . . . prolonged solitary confinement satisfies the objective prong of the Eighth Amendment test and may give rise to an Eighth Amendment claim, particularly where, as here, Defendants have failed to provide any meaningful penological justification." *Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 451 (3d Cir. 2020) (citing *Porter v. Clarke*, 923 F.3d 348  (unrelated case). *See also Thomasson v. Premo*, No. 6:14-CV-01788-MO, 2017 WL 2403565, at *3 n.1 (D. Or. June 2, 2017) (unpubl.) (stating that the court was "sensitive to research suggesting that the conditions to which inmates in solitary confinement are subjected often lead to profound psychological peril for the inmate, and as such, the use of solitary confinement itself may implicate an Eighth Amendment violation."); *see also Ruiz v. Texas*, 580 U.S. 1191, ___ (2017) (Breyer, J., dissenting from denial of stay of execution) (noting that the petitioner "developed symptoms long associated with solitary confinement, namely severe anxiety and depression, suicidal thoughts, hallucinations, disorientation, memory loss, and sleep difficulty").

right to being single-celled. That determination must be institution-, inmate-, and fact-specific. In the modern era, the Constitution requires that prison officials consider numerous factors in determining housing assignments, including the goal of limiting the time inmates live isolation, insofar as that is possible. Plaintiff's reliance on the *Balla* case does not provide sufficient allegations to form a plausible claim in a different era, in a different facility, and under different circumstances.

## I.    *Conclusion*

The Court has considered the personal incidents alleged, not only as to Plaintiff's attempt to show a pattern of violence caused by double-celling constituting a risk of serious harm,[7] but, as to the fourth incident (the Allen attack),[8] simply a one-time failure to protect Plaintiff. The Court concludes that Plaintiff has provided insufficient facts to support either type of claim. Nothing in the pleadings, record, Martinez report, or Spears hearing shows that any prison official reviewed Plaintiff's alleged emergency e-mail or that any official was otherwise notified that Plaintiff was at risk of being attacked by a particular inmate or set of inmates. Even beyond showing *notification* to a defendant, Plaintiff must have some facts showing that a defendant *drew an inference* that Plaintiff was at risk of serious harm from Young, Allen, or the other inmates allegedly plotting the Allen attack, and yet the Defendant recklessly ignored the risk of harm. The facts are not anything

---

[7]    The Court recognizes that an inmate "does not have to await the consummation of threatened injury to obtain preventative relief," but may file for injunctive relief from a threat of harm. *Farmer*, 511 U.S, at 845.

[8]    The second incident, from 2019, is beyond the statute of limitations if construed as a stand-alone claim.

like *Wilk*, where the victim asked for protection from a serious known threat, but was ignored before he was attacked by the inmate he had identified.

The Amended Complaint does not contain sufficient causal links between the double-celling of close-custody and/or mentally ill inmates and Plaintiff's injuries. In addition, the drafter of the Complaint has misstated several key pieces of evidence contained in the prison record attachments to attempt to state a claim. Regardless of who drafted the Amended Complaint, Plaintiff has "verified" and "declare[d] under penalty of perjury" that "all statement [sic] herein, are true to the best of [his] knowledge," although his own attached exhibits show some of his key allegations are not true. The claims that Defendants caused a serious risk of violence by double-celling Plaintiff and other ISCC close-custody and mentally-ill inmates during 2020 through 2022 will be dismissed for failure to comply with a prior court Order (Dkt. 2 at 2) under Federal Rule of Civil Procedure 41(b) and for failure to allege facts sufficient to state a plausible claim upon which relief can be granted.

### 2. Claims of Serious Risk of Aggressive Sexual Assaults Caused by Double-Celling Inmates

Plaintiff's allegation that there was an unreasonable number of aggressive sexual assaults on the ISCC close-custody unit has no factual basis. Plaintiff does not report that he was sexually assaulted at ISCC. Nor does he provide specific facts showing that he himself had reason to be in fear of sexual assault, such as recounting a pattern of assaults he witnessed.

The same serious sexual assault allegations were made in the Carr-drafted pleadings in Case 409, from which this case was severed. After inmates testified at a Spears hearing to clarify their own allegations, Judge Grasham concluded: "It was clear from Plaintiffs' collective testimony that the number of J-block sexual assaults and whether Plaintiffs actually witnessed such

assault w[ere] greatly exaggerated in Pleadings." (*See* Dkts. 135, 136, 139 at 29 in Case 409 (sealed)). For example, "[a plaintiff] testified that the allegation in his Complaint that '99.1 percent of Prison Rape Elimination Act [PREA] complaints appear to be covered up' was not his own. Dkt. 135, pp. 59-60." (Case 409, Dkt. 139 at 31).

In Case 409, in addition to inmate testimony, the Court required prison officials to disclose detailed records of sexual assault allegations and investigations at IMSI. (*See* Case 409, Dkt. 123, Sealed IMSI PREA records). Judge Grasham found, concluded, and recommended:

> The information provided shows that the sexual assault cases are thoroughly investigated and routed to the facility PREA Compliance Manager, who reviews the investigations and finalizes the findings. *See* Teresa Jones Decl., Dkt. 57-2. The incidents reported were categorized either as sexual abuse, because, consistent with PREA, they included allegations of some type of inappropriate touching; or as sexual harassment outside of PREA, because no inappropriate touching was involved, a definition also consistent with PREA. A few of the original sexual assault complaints were later confirmed as false by the complainant during an interview. Other cases were deemed consensual, based on interviews with both inmates. *See* Sealed Exhibits 1 through 10.

> When inmates say that they never see PREA allegations go very far, it is unclear what they want to see happen. Inmates testified of prison disciplinary proceedings for persons engaging in sexual acts. In most instances where sexual abuse, verbal sexual harassment, or a fear of sexual assault was reported by inmates, even where the report was deemed "unfounded" after investigation, prison officials nevertheless separated the inmates by moving the inmates into different cells and/or walks.

> Based on the foregoing, Plaintiffs have not stated a claim for relief. There are not enough incidents showing that sexual abuse was an unreasonable risk of danger or unchecked when reported, or that a fear of sexual assault went without a remedy in J-block. Plaintiffs— none of whom was sexually assaulted in J-block—have not stated a viable threat of risk of injury claim. Any inmates who were sexually assaulted in J-block have or had opportunity to bring grievances and individual civil rights actions.

SUCCESSIVE REVIEW ORDER - 21

(Case 409, Dkt. 139 at 31-32).

Similarly, here, there are no plausible allegations showing a pattern of aggressive (or nonconsensual) sexual assaults that occurred at ISCC during the time frame at issue. Plaintiff had ample opportunity to find additional facts supporting this claim during the eighteen-month amendment time frame, and yet he has proffered nothing more in support of this vague allegation. This claim will be dismissed for failure to comply with a prior court Order (Dkt. 2 at 2) under Rule 41(b) and for failure to allege facts sufficient to state a plausible claim upon which relief can be granted.

### 3. Retaliation

In the Amended Complaint, Plaintiff asserts that the Allen attack was the result of retaliation by Defendants. He asserts that Defendants placed him in Allen's unit as retaliation for having participated in "Carr's case and the February 2021 consolidated declaration of the D-1 inmates at ISCC and my/our request to make it a class action case" in Case 409. (Dkt. 8 at 4-5).

Plaintiff has failed to state a claim for relief with these vague allegations. He has not stated who was responsible for moving him or why that person had a stake in the other litigation, which would show that a motive for retaliation existed. Plaintiff has not stated how the prison official who moved him would have known that inmates in that unit would later combine to induce Allen to assault him after his placement in that unit. This claim does not comply with the previous Order requiring any amended complaint to contain facts specifying the "who, what, where, when, why, and how" of each of Plaintiff's personal claims. (Dkt. 2 at 2). Rather, it is based completely on speculation and is aimed at no particular defendant.

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a plaintiff to provide a defendant fair notice of the claims against him. *See also Twombly*, 550 U.S. at 555. Claims must be pleaded with sufficient specificity to put a defendant on notice of the allegations against him so that the defendant can adequately prepare a defense. "Conclusory allegations that an indistinguishable group of defendants essentially engaged in identical misconduct . . . are insufficient to show that plaintiff is entitled to relief from any *individual* defendant." *Williams v. Cnty. of Los Angeles Dep't of Pub. Soc. Servs.*, 2016 WL 8730914, at *5 (C.D. Cal. May 2, 2016) (unpubl.) (emphasis in original); *see Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988) (a plaintiff must allege the basis of his claim against each defendant and not lump them together in broad allegations).

Because Plaintiff has had adequate time and opportunity to amend this claim, it will be dismissed for failure to comply with a prior court Order (Dkt. 2 at 2) under Rule 41(b) and failure to allege facts sufficient to state a plausible claim upon which relief can be granted.

### 4.   Unit Lockdown and Exercise/Recreation Denial

Plaintiff asserts that, when he lived in Unit D-1 at ISCC, the unit was in a constant state of lockdown. He states he was denied "basic human needs" and lists various services without any elaboration, such as denial of "e.g., mental health care, medical care, and religious services," (Dkt. 8 at 17), and "job options, programs, religious services, or incentives" (*id*. at 8). Many of these examples are not supported with any factual allegations whatsoever from Plaintiff's personal experience, but appear to be general allegations of the drafter included in other inmates' pleadings. For example, Plaintiff does not state he attempted to attend religious services and was prevented from doing so. He does not provide facts that he was otherwise qualified to hold a job, be in a

program, or have "incentives," especially given his history of being a perpetrator of repeated acts of violence in the prison system.

It is clear from elsewhere in the Amended Complaint that Plaintiff was receiving "strong prescription medication" for his mental illness, as noted above, and thus the allegation that he did not have mental health care is exaggerated or false. He provides no instance of requesting, but not receiving, health care. Relevant prison records show that, whether Plaintiff was a perpetrator or victim of an incident, medical personnel examined him and provided medical care. (*See* Case 409, Dkt. 57-5 at 24, 29). Plaintiff *does* provide, however, factual allegations personal to himself that he could not exercise, go outside, use the laundry sink or microwave, call family or friends, or meet with other inmates. (Dkt. 8 at 8).

### A.  Standard of Law

"[E]xercise is 'one of the basic human necessities protected by the Eighth Amendment.'" *May v. Baldwin*, 109 F.3d 557, 565 (9th Cir. 1997) (quoting *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993)). "[T]he Constitution requires [prison] officials to provide outdoor recreation opportunities, or otherwise meaningful recreation, to prison inmates." *Norbert v. City & Cnty. of San Francisco*, 10 F.4th 918, 931 (9th Cir. 2021) (citation omitted). In *Norbert*, the Court emphasized that it has never held that "the Eighth or Fourteenth Amendments categorically required exercise to take place outdoors regardless of any indoor recreation options." *Id*.

There is no "bright-line" rule setting forth the amount of time or circumstances under which inmates may be denied out-of-cell exercise before the deprivation is considered "sufficiently serious" to invoke Eighth Amendment protection. The Ninth Circuit has consistently held the "long-term" denial of exercise may violate the Eighth Amendment. *See Lopez v. Smith,* 203 F.3d

1122, 1132-33 (9th Cir. 2000) (en banc) (holding a six and one-half-week denial sufficient to satisfy the objective component of an Eighth Amendment violation); *Keenan v. Hall,* 83 F.3d 1083, 1089 (9th Cir. 1996), *as amended* 135 F.3d 1318 (9th Cir. 1998) (finding triable issues of fact regarding six-month deprivation of exercise).

In *Noble v. Adams*, 646 F.3d 1138, 1143 (9th Cir. 2011), the timing of the deprivation of exercise was at issue: the prison had experienced a major riot, and prison officials gradually eased up the resulting lockdown. The Ninth Circuit Court held that it was not clearly established in 2002—nor in 2011—precisely how, according to the Constitution, or when a prison facility housing problem inmates must return to normal operations, including outside exercise, during and after a state of emergency called in response to a major riot, in which inmates attempted to murder staff. *See Norwood v. Vance*, 591 F.3d 1062, 1070 (9th Cir. 2010) (rejecting claims that prison officials had no need to continue exercise restrictions after initial investigation of assaults were completed and finding defendants entitled to qualified immunity).

Courts have held that the lack of dayroom access alone, without an exercise component, does not rise to the level of a constitutional deprivation, nor does it constitute an atypical or significant hardship. *See, e.g.*, *Arsberry v. Illinois*, 244 F.3d 558, 564 (7th Cir. 2001); *Postlewaite v. Godinez*, No. 14-CV-501-JPG, 2014 WL 2892381, at *2 (S.D. Ill. June 26, 2014).

### B. Plaintiff's Lock-Down Claims

Plaintiff's allegations that he could not use the laundry sink or microwave, call family or friends, or meet with other inmates during lock-down, without additional facts, does not state a plausible constitutional violation. While Plaintiff's exercise claims may be of constitutional significance, he has stated no particular dates for this claim, a requirement specified by the Court's

prior Order. (Dkt. 2 at 2). Nor has he stated to whom he reported this problem or the nature of the response. Without tying together a Defendant, notice to that Defendant, facts showing the Defendant drew an inference of a serious risk of harm, and information that the Defendant failed to remedy the risk despite drawing an inference. Plaintiff has not stated a plausible claim that any Defendant acted with subjective deliberate indifference regarding Plaintiff's reports of prolonged lockdowns and failure to provide out-of-cell time, and adequate indoor or outdoor exercise in ISCC Unit D-1.

Plaintiff asserts that he should be excused from providing facts because he does not have any of his concern forms or grievances: he was "released from prison, then, rearrested, sent to county jail, then to prison. Plaintiff's copies are not in his possession because of this." (Dkt. 8 at 19). However, Plaintiff has not explained why he did not use his concern forms and grievances to find relevant facts when he was drafting his original Complaint in 2022, well before he was released on parole. Nor has he stated whether he took his concern forms and grievances with him when he was released, and, if so, where he left them when he was rearrested, and why he cannot obtain copies of them from friends or relatives who took possession of them (or whether Plaintiff simply abandoned his court records when he was rearrested).

Plaintiff has had eighteen months to research, investigate facts, and amend his Complaint. If he did not have his offender concern forms or grievances at any point in time, he could have requested copies from prison officials while he was in prison or on parole. He could have retained an attorney to obtain records and pursue his case. If prison officials would not produce the records directly to Plaintiff or a retained attorney, Plaintiff could have notified the Court of that decision, and the Court could have issued an appropriate Order and extended the deadline for amendment.

Instead, Plaintiff seems to have done nothing in eighteen months to shore up his facts to state a claim.

This conditions-of-confinement claim is subject to dismissal for several reasons. One reason is that Plaintiff has not identified a defendant responsible for these conditions. Another is that Plaintiff has not stated sufficient facts showing that the conditions resulted from the deliberate indifference of prison officials, rather than a general worldwide pandemic lockdown. Plaintiff's claim is for the time frame between June 2020 and 2022. "On March 11, 2020, the World Health Organization (WHO) declared COVID-19, the disease caused by the SARS-CoV-2, a pandemic."[9] On May 5, 2023, "[w]hile acknowledging the remaining uncertainties posted by potential evolution of SARS-CoV-2, [the Emergency Committee on the COVID-19 pandemic] advised that it is time to transition to long-term management of the COVID-19 pandemic," recognizing the end of the worldwide pandemic.[10]

Plaintiff had sufficient time and access to resources to obtain and clarify the facts supporting his claim, both while on parole and in prison. Therefore, this claim will be dismissed for failure to comply with a prior court Order (Dkt. 2 at 2) under Rule 41(b) and for failure to allege facts sufficient to state a plausible claim upon which relief can be granted. *See Hebbe v. Pliler*, 627 F.3d 338, 341-42 (9th Cir. 2010) (although pro se pleadings are construed liberally, a plaintiff must allege facts sufficient to state a plausible claim).

---

[9]     *See* https://www.yalemedicine.org/news/covid-timeline (accessed 12/20/2024).

[10]     *See* https://www.who.int/news/item/05-05-2023-statement-on-the-fifteenth-meeting-of-the-international-health-regulations-(2005)-emergency-committee-regarding-the-coronavirus-disease-(covid-19)-pandemic?adgroupsurvey=%7Badgroupsurvey%7D%26gclid=EAIaIQob ChMI4Ojtsdbe_gIVjQRyCh07igt4EAAYASACEgJ9pfD_BwE%26fbclid=IwAR2M8EAyiSrAo dhK9p- X582nHkP2AigpSX8pYIsLsPwqYh4SG26RGokGe7E (accessed 12/20/2024).

### 5.  Denial of Due Process

Plaintiff also asserts that his due process rights were violated when Defendant Chad Page revised the standard operating procedures so that inmates in close custody/protective custody would not have the same privileges as those in administrative segregation, such as deletion of three hours of out-of-cell time for close custody/protective custody, and inmates would not have the same due process procedures, such as specific shorter time limits in between housing reviews. (Dkt. 8 at 10, 15, 17).

To maintain a due process claim, Plaintiff must show that he had a liberty interest in three hours of out-of-cell time per day. A prison policy or procedure does not necessarily reflect a minimum constitutional standard. So long as prison policies satisfy minimum constitutional requirements, the civil rights statute does not require a prison to comply with its "own, more generous procedures." *Walker v. Sumner*, 14 F.3d 1415, 1420 (9th Cir. 1994), *abrogated on other grounds by Sandin v. Conner*, 515 U.S. 472 (1995).

"The Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed." *Sandin*, 515 U.S. at 480. In the prison context, liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . . nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id*. at 484 (internal citations omitted).

There are insufficient facts supporting this claim—no dates or instances showing that Plaintiff requested a hearing, review, or other due process procedure to be moved from the D-1 close-custody/protective-custody unit, or from the G-1 close-custody unit, and yet was denied a

hearing or other due process protections. When he asked to be placed in protective custody from the G-2 close-custody unit after the Allen incident, he was provided with an extended interview, to be followed by an administrative review. (*See* Dkt. 8-1 at  2). Plaintiff does not provide any facts about the outcome of that request.

This claim will be dismissed for failure to comply with a prior court Order (Dkt. 2 at 2) under Rule 41(b) and for failure to allege facts sufficient to state a plausible claim upon which relief can be granted.

### 6.  Conclusion

Plaintiff was provided with adequate instructions, adequate time, and adequate opportunity for amendment of his claims. Importantly, Plaintiff was instructed to provide particular facts in his Amended Complaint. He has not provided sufficient facts to support any of his claims. Defendants could not properly defend in this lawsuit, where the allegations are general and no causal links between a Defendant's act and a claim or injury is supported by facts. Also important to the Court's decision to dismiss this action is that these claims arose from a past time period. Plaintiff can assert allegations of present harm in proper concern forms, grievances, grievance appeals, and then seek injunctive relief in a civil rights lawsuit, if necessary. Therefore, the pleadings, and this entire case, will be dismissed with prejudice for failure to comply with a prior court Order (Dkt. 2 at 2) under Rule 41(b) and for failure to allege facts sufficient to state a plausible claim upon which relief can be granted for the time period 2020 through 2022.

## ORDER

**IT IS ORDERED** that Plaintiff's Amended Complaint (Dkt. 8) and this entire action are DISMISSED with prejudice.

DATED: January 27, 2025

Amanda K. Brailsford
U.S. District Court Judge